SUMMERS, Justice.
 

 Plaintiffs, lessors, instituted this suit against defendant, lessees, for cancellation of the oil, gas and mineral lease granted by them on March 29, 1957. Plaintiffs relied upon the propositions that the primary term of the lease expired on March 29, 1960, and that there was no production or other compliance by lessee to maintain the lease in force beyond the primary term. The trial court sustained plaintiff’s contention and ordered cancellation of the lease. The Court of Appeal, First Circuit, found that the lease was maintained by the “production” clause and reversed the judgment of the trial court.
 

 Upon the application of the plaintiffs, lessors, we granted writs to review the judgment of the court of appeal.
 

 
 *228
 
 Plaintiffs are Rufus Landry, Brittmar P. Landry, Charles E. Landry, Jr., Octavia Robertson Landry and Mrs. Gertrude Landry Johnson. As owners in indivisión of the leased premises they granted in counterparts an oil, gas and mineral lease, which, by assignment became vested in J. M. Flaitz, R. B. Mitchell and American Climax Petroleum Corporation, as lessees. We will refer to the lease hereafter as the Landry lease. Also joined as defendants were A. M. Simmons, Jr., Felix Savoie, Jr., John L. Burt and Raymond Aucoin, who had acquired certain overriding royalty interests in the lease.
 

 The lease originally affected 100 acres of Voiron Plantation, located near the city of Napoleonville in Assumption Parish. The northern fifty acres having been voluntarily released, the suit involves only the southern fifty acres of the original tract.
 

 The lease dated March 29, 1957, was for a primary term of three years, expiring on March 29, 1960. The annual delay rentals were timely paid on March 29, 1958, and March 29, 1959, thus maintaining the lease in full force and effect through March 29, 1960, the expiration date of the primary term.
 

 Within the last year of the primary term, on December 5, 1959, a well known as the F. A. Callery-Oscar Hebert No. 1 Well (hereinafter referred to as the Hebert well), was “spudded in” on a tract immediately south of the leased premises. Application for permit to drill this well had been made by F. A. Callery, Inc., on November 17, 1959. A drilling permit was issued on December 1, 1959, subject to the condition or exception that “in the event the well was completed as a producer a suitable unit must be formed around the well in compliance with the provisions of Statewide Order #29-E before an allowable will be issued the well.”
 

 The tract on which the well was drilled was within a unit area, comprising 161.78 acres, created by voluntary declaration on April 15, 1957, between deféndants and others, among whom was F. A. Callery, Inc., designated operator for the voluntary unit. Defendants’ ownership therein being equivalent to a fraction of one per cent (actually .94 of one per cent). This percentage of interest also determined the extent of defendants’ obligation for drilling costs. This voluntary unit area did not include the fifty acres affected by the Landry lease. The voluntary unit area had been formed in contemplation of drilling the No. 1 Bourg well which was drilled and completed as a gas well. Under this same agreement another gas well, the No. 1 Dugas, was drilled and completed. The Hebert well was drilled in the oil column of the reservoir, under the operating agreement previously entered into and in accordance with the participation therein assigned as an offset to an oil well in a near
 
 *230
 
 by unit. Prior to the spudding in of the Hebert well, the defendants offered to increase their .94 per cent participation in the cost of the Hebert well based upon their belief that a portion of their Landry lease should be included in the oil unit which would be formed around this well. However, an accord could not be reached among the parties to the operating agreement.
 

 As a result, defendants, on January 22, 1960, applied to the Commissioner of Conservation for a forced unit surrounding the well in order that a portion of the Landry lease would be included in the unit to be formed around the Hebert well by the force of an order of the Commission, and in order that the voluntary unit would thereby be superseded. The well was dual completed as a well capable of producing oil in paying quantities on or about January 25, 1960, and shut in. Pursuant to defendants’ application of January 22, 1960, a hearing was held on March 11, 1960, and, on March 28, 1960, one day prior to the expiration of the primary term of the contested lease, Order No. 140-C-d was issued (effective March 15, 1960) by the Commissioner of Conservation creating a 53.97 acre-unit around the Oscar Hebert No. 1 Well, including therein 9.245 acres from the southern portion of the Landry lease, thereby increasing defendants’ participation in both the production and costs of the Hebert well to the extent of the ratio which 9.245 acres bears to 53.97 acres. The Hebert well was designated as the unit well and F. A. Callery was named operator.
 

 On April 1, 1960, the operators of the Hebert well asked for a potential test rn the well with the request that the allowable be made effective April 1, 1960. Production in paying quantities was commenced on that day. An allowable of 137 barrels of oil per day was subsequently granted retroactive to April 1, 1960. The reason th: allowable could be made effective April 1, 1960, although the required potential test was not made until April 4, 1960, is found in Statewide Order 29-B, which expressly permits retroactive effect not in excess of five days. The well has produced in paying quantities since that date. Lessors have refused all tenders of royalty and, subsequently, after a letter demand for cancellation of the lease, instituted this suit on July 27, 1960.
 

 From the foregoing recital of facts, it is clear that there was no production from the lease in controversy or from land pooled or unitized therewith within the primary term of the lease.
 

 Defendants answer plaintiffs’ contention that the lease had expired on March 29, 1960, by asserting that the lease was maintained in force and effect beyond the primary term: (1) because a portion of the lease was force-pooled around a completed oil well during its primary term; (2) because valid governmental regulations pro
 
 *232
 
 Tiibitecf the production of the unit well until three days after the expiration of the primary term; (3) because under the law and paragraph 13 of the lease, to which we will refer hereafter, the lessees’ obligation to produce was suspended during such period; and (4) because compliance with the obligation to produce commenced coincidentally with the removal of the legal impediment, thereby maintaining the lease under the provisions of the habendum clause providing that the lease shall be maintained in effect “so long thereafter as oil, gas or some other mineral is being produced *
 

 It is well-settled in the jurisprudence of this State that production of minerals from a unit is tantamount to production from all lands within that unit. LeBlanc v. Danciger Oil & Refining Co., 218 La. 463, 49 So.2d 855 (1950) ; Hunter Co. v. Shell Oil Co., 211 La. 893, 31 So.2d 10 (1947); Hardy v. Union Producing Co., 207 La. 137, 20 So.2d 734 (1944).
 

 In the case before us, inasmuch as the Hebert well was not producing at the expiration of the primary term, the question arises as to whether the discovery of a well capable of producing in paying quantities on a production unit is sufficient to satisfy the requirement of the habendum clause of the lease that the lease will be maintained in force beyond the primary term “so long * *
 
 *
 
 as oil, gas or some other mineral is being
 
 produced
 
 * *
 
 * ”
 

 Discovery of a well capable of producing minerals in paying quantities does not satisfy the requirement that oil, gas or some other mineral be
 
 produced
 
 under the habendum clause in order to continue the lease in full force and effect beyond the primary term. In the case of an oil well there must be actual production in progress at the time of the expiration of the primary term in order that the life of the lease may be continued beyond the primary term. This same rule applies whether the well is located on the leased premises, or the leased premises are included in a unit formed under existing laws and regulations. In Davis v. Laster, 242 La. 735, 138 So.2d 558 (1962) we observed in connection with a similar lease that:
 

 “The plain language of the lease contract provides for its termination at the end of the primary term, unless it can be considered that oil, gas or other minerals are being produced from the leased premises or lands pooled therewith. The production required to maintain the lease must be either actual or constructive.”
 

 Unitization orders issued by the Commission will not alter a requirement that there be production to maintain the lease beyond the primary term to mean that the mere discovery of oil is sufficient to maintain the lease beyond the primary term.
 

 
 *234
 
 This proposition is supported by Cox v. Acme Land & Investment Co., 192 La. 688, 188 So. 742 (1939), wherein this court observed :
 

 “The discovery of oil or gas never extends the primary term of a mineral lease, which is that period stipulated by the parties during which the lease may be kept alive by means other than the actual production of oil or gas.”
 

 Not only must there be actual •production of oil to maintain the lease beyond the primary term under the habendum ■clause, but that production should be understood to mean production in paying quantities in the absence of a stipulation that it should be production in paying ■quantities. Caldwell v. Alton Oil Co., 161 La. 139, 108 So. 314 (1926); Green v. Standard Oil Company of Louisiana, 146 La. 935, 84 So. 211 (1920).
 

 We are aware that in some jurisdictions '“discovery” rather than “production” is •sufficient to hold the lease beyond the ■primary term where the well was capable •of production but had not in fact been produced. Williams, Oil and Gas Law, Sec. •604.1 (1962 ed.). However, such a result • cannot obtain in this state in view of the language of the contested lease. LSA-Civil ■Code, art. 1901.
 

 Next, we must consider whether an • obstacle existed to the production of oil during or at the time of the expiration of the primary term, and whether that obstacle, under paragraph 13 of the lease, was of such a nature that lessees’ obligation to produce was suspended until the obstacle was removed.
 

 Paragraph 13 of the lease relied upon by defendants is what is sometimes known as the “Force Majeure” clause and it provides as follows:
 

 “13.
 
 The requirements hereof shall be subject to any State and/or Federal law or order regulating operations on the land. It is further agreed that should Lessee be prevented from complying with any expressed or implied covenants of this lease,
 
 from conducting drilling or reworking operations thereon
 
 or from producing oil,, gas or other mineral therefrom
 
 by reason of scarcity or inability, after effort made in good faith, to obtain equipment or material or authority to use same, or by failure of carriers to transport or furnish facilities for transportation, or
 
 by operation of
 
 force majeure,
 
 any federal or state law, or any order, rule or regulation of governmental authority, or other cause beyond Lessee’s control, then while so prevented, Lessee’s obligation to comply with such covenant shall be suspended
 
 and Lessee shall not be liable for damages for failure to comply therewith;
 
 and this lease shall be extended while and so
 
 
 *236
 

 long as Lessee is prevented by any such cause from
 
 conducting drilling or reworking operations on or from
 
 producing
 
 oil,
 
 gas or other mineral from the leased premises
 
 and the time while Lessee is so prevented shall not be counted against Lessee.” (Emphasis supplied.)
 

 Whether the lessees were prevented from producing the well prior to the expiration of the primary term is a question of fact. Lessees contend that when the drilling permit was issued it contained a condition or exception to the effect that “in the event the well was completed as a producer a suitable unit must be formed around the well in compliance with the provisions of Statewide Order #29-E before an allowable will be issued the well.”
 

 The foregoing exception, read in connection with paragraph 13 of the lease, lessees say, constitutes an obstacle in the form of a governmental order preventing lessees from producing the well until a “suitable unit” had been formed and an allowable issued. Therefore, at the end of the primary term, no allowable having been issued because the Conservation Commission unit had just been formed the day before and administrative delays would not permit an earlier issuance of the allowable, the obligation to produce was suspended and the lease did not expire.’ ’ The lease, therefore, remained in effect until the obstacle was removed by the formation of the unit and the subsequent granting of an allowable, at which time lessees proceeded forthwith to produce the well in paying quantities.
 

 Plaintiffs lessors answer this contention by saying that the granting of an allowable was not dependent upon the formation of a unit by the Commissioner of Conservation ; that an allowable could have been obtained within twenty-four hours at any time after January 25, 1960, the date the well was-completed, and, consequently, no regulation preventing production was in effect, which could not have been easily removed, and, therefore, the lease expired by its term.
 

 In support of their position that the condition in the permit did not constitute an obstacle to producing the Hebert well during the primary term and at the time of its expiration, counsel for plaintiffs point to Statewide Order #29-E to which reference was made in the drilling permit. That order, in pertinent part, provides:
 

 “(4) When a permit is requested for a wildcat well to be drilled in an area in which the surface or mineral ownership is so divided that the well cannot be located in compliance with the requirements of. this Order and a drilling unit cannot be formed in advance of drilling because it is not known whether the well Will be completed as an oil well or a gas well, a permit may nevertheless
 
 *238
 
 be granted for the drilling of the well when the applicant presents evidence satisfactory to the Commissioner that the applicant has available for assignment to said well leases or acreage of area and size to constitute, in the judgment of the Commissioner, a reasonable producing unit for such well and such applicant agrees to create or to apply to the Commissioner for creation of a reasonable producing unit within a reasonable time after completion of the well.”
 

 In explanation of the meaning to be attributed to the foregoing provision of Statewide Order #29-E, Mr. Randolph H. Parrou, Manager of the Houma District Office of the Department of Conservation, was called to testify. His testimony is to the effect that an allowable for producing a well cannot be issued until a unit is formed. However, if the operators of the well own the leases surrounding the well and there are no lands on which they do not own the leases within a prescribed distance from the well (330 feet in this case), then the operators may submit a plat designating a voluntary unit surrounding the well affecting their leased acreage and this plat will serve as a basis for the issuance of a temporary allowable, pending the formation of a unit by the Commissioner of Conservation.
 

 In view of this explanation and Mr. Parrou’s testimony to the effect that he would have issued an allowable if such a plat as he described were filed at any time after the date of the completion of the well, and in view of the fact that the parties to the operating agreement did own the leases within the prescribed area surrounding the well, there was no order or regulation preventing lessees from producing during the primary term or at the time of the expiration thereof. Hunter Co., Inc. v. Vaughn, 217 La. 459, 46 So.2d 735 (1950); Logan v. Blaxton, 71 So.2d 675 (La.App.1954).
 

 There are other clauses of the lease upon which defendants rely to support their position that the lease did not lapse at the end of the primary term.
 

 One of those clauses, paragraph 4, relates to the delay allowed between successive drilling operations prior to the discovery and production of minerals. It is inapplicable to the facts of this case.
 

 The other clause relied upon is contained in paragraph 6. It applies to a situation where production “ceases”, meaning that the well is no longer capable of producing. That clause does not apply to a “shut-in” oil well such as we have in the case at bar. There is no provision in the lease to maintain the lease beyond the primary term by payment of lieu royalties or rentals for a “shut-in” oil well.
 

 For the reasons assigned we find that the lease in question expired by its term on March 29, 1960.
 

 
 *240
 
 According^, the judgment of the court of appeal is reversed. The judgment of the trial court ordering the cancellation of the contested lease is reinstated, affirmed and made the judgment of this court.