220 So.2d 783 (1969)
Robert B. PRENTICE et al., Plaintiffs-Appellees,
v.
AMAX PETROLEUM CORPORATION et al., Defendants-Appellants.
No. 7549.
Court of Appeal of Louisiana, First Circuit.
March 13, 1969.
Rehearing Denied April 14, 1969.
H. H. Hillyer, Jr., New Orleans, for defendants.
Triche & Sternfels, Napoleonville, Amicus Curiae.
Claude B. Duval, Houma, for plaintiffs.
Before LOTTINGER, ELLIS and BAILES, JJ.
BAILES, Judge.
This is a suit for declaratory judgment in which plaintiffs, Robert B. Prentice and *784 M. H. Marr (Prentice-Marr), seek to be recognized as owners of a certain oil, gas and mineral lease as against the ownership claim of defendants, Amax Petroleum Corporation and R. B. Mitchell (hereinafter collectively referred to as Amax). The lease was granted in 1960 by Mrs. Octavia Robertson Landry, et al. (the Landrys) to Leo J. Caballero and subsequently assigned to plaintiffs. Incidental to this main demand against Amax are demands for an accounting of the proceeds of oil production attributable to the lease and other appropriate relief. Named as additional defendants are Callery Properties, Inc. (Callery) and Pan American Petroleum Corporation (Pan Am), operators of conservation units which include portions of the leased property who hold some of the production proceeds from the oil wells on the property. The plaintiffs' demands against these defendants are for judgment declaring the defendants without authority to withhold payment of the proceeds from them and for an accounting of the proceeds and costs attributable to the leased property.
This matter was before us previously on appeal from a judgment granting a motion for summary judgment. Prentice v. Amax Petroleum Corporation, La.App., 187 So.2d 752. Inasmuch as the pleadings of the parties are detailed in that decision we will not burden this opinion with a complete recital of them. Suffice it to say that plaintiffs, Prentice-Marr, claim ownership of a mineral lease dated January 29, 1960, from the Landrys to Caballero, as it affects the south 50 acres of the western most 100 acres of the Viorion Plantation in Assumption Parish by reason of an assignment from Caballero to them, February 17, 1964, and the expiration and cancellation by judgment of the Supreme Court. Landry v. Flaitz, 245 La. 223, 157 So.2d 892, of a 1957 three year lease on the same property granted by the Landrys to the assignor of Amax. Plaintiffs seek declaratory judgment recognizing their ownership of the lease and ordering an accounting for the production proceeds attributable to the lease. Amax admits the execution and recordation of the 1960 Landry lease but denies plaintiffs' ownership therein. Amax claims that due to certain operating agreements existing between itself, plaintiffs and others a joint adventure and fiducial relationship was created and that plaintiffs' acquisition of the 1960 Landry lease inured to their benefit.
We found on the appeal from the summary judgment that a genuine issue of material fact existed and remanded the matter for trial on the merits. The trial was held and the trial court rendered judgment in favor of the plaintiffs and against the defendants declaring that plaintiffs were the true and lawful owners of the 1960 Landry mineral lease by assignment from Caballero, ordering the defendants to render an accounting and pay to plaintiffs the proceeds of production attributable to the lease in accord with the operating agreements and, finally, directing that a notice of lis pendens filed by Amax be cancelled. Callery and Pan Am stipulated at the trial that they would render an accounting and pay any proceeds due in accordance with the final judgment rendered herein. Therefore, only Amax, Amax Petroleum Corporation and R. B. Mitchell, appealed. Plaintiffs neither appealed nor answered the appeal thereby abandoning all demands except those recognized in the judgment appealed.
The factual background of this matter is complex but the material facts may be outlined as follows. On March 29, 1957, the Landrys granted a three year mineral lease to J. M. Flaitz on the western most 100 acres of the Viorion Plantation (the 1957 Landry lease). This lease was subsequently assigned to Amax and thereafter the northern 50 acres were released. Later, on April 15, 1957, Prentice-Marr, Amax (actually the predecessors of the Amax Petroleum-Mitchell combine) and others entered an oil and gas lease operating agreement, pooling leases owned by the parties and creating a 160 acre operating area.
*785 The Landry property was not included, its southern boundary being the northern line of the operating area. Under this agreement, on January 25, 1960, an oil well was completed in the operating area, the Hebert No. 1 well. On January 29, 1960, Caballero, secured a top lease from the Landrys (the 1960 Landry lease). It included a clause that it was not to be in conflict with any lease then in existence but was to take effect immediately upon expiration of any such prior lease. It was not recorded until December 23, 1963. An assignment of the lease to plaintiffs was recorded February 18, 1964, effective as of the original date of the lease. In March, 1960, a portion of the Landry property, covered by both the 1957 Landry lease and the 1960 Landry top lease, was force pooled by order of the Commissioner of Conservation with lands covered by the 1957 operating agreement. The order created two units affecting the area in question; one, designated Unit #9, around the Hebert No. 1 well, and the other, Unit # 10, on property immediately adjacent on the east. Callery and Pan Am were designated operators of Units #9 and #10 respectively. A productive well, Simoneaux No. 1, was drilled in Unit #10 thereafter. During this period operating agreements were executed by the parties involved in these conservation units. On October 6, 1960, such an agreement was confected between plaintiffs, Amax, Callery and others for the operation of the Hebert No. 1 well in Unit # 9. The agreement for the operation of Unit # 10 between plaintiffs, Amax, Pan Am and others had been executed March 15, 1960.
In the meantime, pursuant to an agreement between Caballero and the Landrys, suit was instituted July 27, 1960, seeking cancellation of the 1957 Landry lease due to expiration of its three year primary term, the Hebert No. 1 well not having been put into production until April 1, 1960. On November 12, 1963, the Supreme Court of Louisiana rendered judgment ordering cancellation of the 1957 Landry lease claimed by Amax. Landry v. Flaitz, supra.
Proceeds of production from the Hebert No. 1 well attributable to the Landry property for the account of the lessor(s) were paid to Amax until October 1963, and proceeds subsequent thereto were retained by Callery. A similar situation exists with respect to the proceeds of the Simoneaux No. 1 well, payment of proceeds realized prior to March, 1964, having been paid to Amax and proceeds accruing thereafter having been retained by Pan Am.
Plaintiffs contend that the 1960 Landry lease is owned by them and that they are therefore entitled to the production proceeds and an accounting. Amax takes the position that the operating agreements recognized Amax's ownership of the production attributable to the Landry lease; that these agreements establish a joint relationship creating mutual fiduciary obligations and that plaintiffs' top lease was taken in violation of such obligations and as such inures to their benefit.
At the trial of this matter no witnesses were called to testify. Both parties rested their cases after introducing documents from which the foregoing recital of facts was gleaned.
Thus, plaintiffs established their ownership of the 1960 Landry lease by introduction of the top lease, the assignment from Caballero to them and a letter from Caballero to Mr. Rufus Landry, Sr., agreeing to pay an additional consideration for the lease should it become effective. The existence of the dispute between plaintiffs and Amax was proved by a letter from Amax to the Landrys claiming that the 1960 lease inured to their benefit and a notice of lis pendens filed in connection with a suit brought by Amax against Prentice-Marr in the U. S. District Court for the Eastern District of Louisiana. As proof of the cancellation of the 1957 Landry lease plaintiffs placed in evidence a copy of the November 12, 1963, decision of the Supreme Court in Landry v. Flaitz, supra, and the record in that case. Finally, to support the demand for an accounting *786 plaintiffs introduced Conservation Commission Order No. 140-C-d of March 28, 1960, creating the units involved, the operating agreements relative to those units and two assignments of overriding royalties.
Amax introduced the 1957 leases from the Landrys to Flaitz, the assignments of overriding royalties in those leases, the assignment of a seven eights interest in the leases to Amax and the releases affecting the northern fifty acres of the Landry property. In addition, they placed in evidence the operating agreement of April 15, 1957, and three Department of Conservation orders. Finally, two agreements between Caballero and the Landrys, one dealing with the law suit to cancel the 1957 Landry lease and the other an acknowledgement of payment of the additional consideration for the 1960 lease which had become effective, were introduced. The answers of Robert B. Prentice to interrogatories were also put into the record by Amax.
The only other evidence before us is a stipulation in which the plaintiffs, and all defendants agree upon the amounts paid by Amax or to Amax relative to the Landry lease and the time periods for which such payments were made.
From these documents we may add the following facts to those heretofore mentioned. The parties to this suit had, for some years, in differing relationships as evidenced by different operating agreements, engaged in developing the Napoleonville Field in which the wells in question were located. The Department of Conservation, upon discovery of the existence of an oil rim on the northern periphery of the field, established, in 1958, a pattern of conservation units which would have, if extended eastward toward the Landry property, encompassed a portion of that property and part of the property covered by the 1957 operating agreement under which the Hebert No. 1 well was completed. Four days after the successful completion of that well plaintiffs' agent, Caballero, acting without disclosing his principals, acquired the 1960 Landry top lease for a bonus of 2,000.00 and agreed to pay an additional $8,000.00 if the top lease became effective. This lease was not recorded on the public records until after the Supreme Court decision in the suit brought to cancel the 1957 Landry lease. This suit had resulted from an agreement of June, 1960, between the Landrys and Caballero, again undisclosed agent for Prentice-Marr, in which Cabellero, in effect, was given the right to completely control the prosecution of the suit.
With these facts before us we turn to a consideration of the matter on the merits. Inasmuch as the main contention advanced by Amax is that the 1960 Landry lease inures to their benefit by virtue of the breach of a fiducial obligation owed by plaintiffs to them as joint adventurers we will consider it first.
The rule is now well established that a claim of interest in a mineral lease by reason of a joint venture cannot be established by parol evidence. Hayes v. Muller, 245 La. 356, 158 So.2d 191. We are therefore able to consider only those written agreements between the parties applicable to the lease in question to determine the validity of the contention advanced by Amax; that is, the rights of Amax in the subject lease must be based on the relationship created by the operating agreements.
At the outset we note that the 1957 operating agreement is not relevant in this proceeding. Not only did the 1957 agreement not include the Landry lease as part of the property in the operating area it created but by express provision in the Callery and Pan Am agreements of 1960, the agreement of 1957 is superceded as far as the leased property included in the two forced units is concerned. Admittedly, certain provisions of the 1957 agreement relative to ownership of production are incorporated by reference into the 1960 agreements. This, however, is not sufficient to incorporate the whole of the 1957 agreement into *787 the later ones especially in light of the fact that such total incorporation by reference would result in a situation in which provisions treating similar contingencies would be in diametric opposition. The later provisions must prevail. The provisions of the 1957 operating agreement are incorporated into the two 1960 agreements only insofar as they determine ownership or participation rights to the production from the lands covered by the 1957 agreement which were included in the forced units. Therefore, the relationship existing between Prentice-Marr and Amax must be determined solely from the provisions of the Callery operating agreement dated October 6, 1960 and the Pan Am operating agreement dated March 15, 1960.
Each of these agreements contain paragraphs which are designed to define the relationship created between the parties. That provision in the Pan Am agreement states:
"13. RELATION OF PARTIES:
"The rights, duties, obligations and liabilities of the parties hereto shall be several and not joint or collective, it being the express purpose and intention of the parties hereto that their ownership in the pooled area covered hereby shall be as tenants in common; and nothing herein contained shall ever be construed as creating a partnership of any kind, joint venture, an association or trust or as imposing upon any one or more of the parties hereto any partnership duty, obligation or liability. Each party hereto shall be individually responsible only for its obligations as set out in this agreement."
The Callery agreement of October 6th, provides:
"23. RELATIONSHIP OF PARTIES:
"(a) It is not the intention of the parties hereto to create a partnership, association, trust or other character of business entity. The duties, obligations, and liabilities are intended and declared to be several and not joint or collective, and nothing contained in this agreement or in any agreement made pursuant hereto shall ever be construed to create a partnership, association, trust or other character of business entity recognizable in law for any purpose, or to impose a partnership, duty, obligation or liability with respect to any of the parties hereto."
As we read these provisions they expressly negative the creation of any type of joint venture, fiducial obligation or similar, though innominate, relationship. Apparently, due to forced unitization these parties were required, of operational necessity, to provide a manner in which the units could be developed and yet, at the same time, did not desire to create any obligation among themselves which would prohibit or hinder individual activity in the area. This type of agreement, as distinguished from the 1957 voluntary agreement in which the parties agreed to act for the joint benefit in all matters, is lawful. The intent of the parties is explicit and we are bound to give it legal effect. Thus, there existed between Prentice-Marr and Amax no joint adventure or fiducial obligation with respect to the acquisition of mineral rights in the area.
We find no merit in the Amax contention that these clauses of the operating agreements are the usual "boiler plate" provisions inserted merely to secure favorable tax treatment and to avoid joint liability to third persons. There are other specific clauses in the agreements treating both of these matters.
The conclusion that the operating agreements did not create fiducial obligations is reinforced when the above cited provisions are read in conjunction with failure of title provisions contained in the agreements. These provisions expressly provide for the situation in which the interest of one of the parties is lost due to failure of title and another party to the agreement acquires *788 that interest. The October 6th agreement provides:
"4. FAILURE OF TITLE: Should any oil and gas lease, or other interest, (including contractual interest in production arising by virtue of the aforementioned Operating Agreement dated April 15, 1957, as amended) be lost through failure of title, this agreement shall, nevertheless, continue in force as to all remaining leases and interests, and,
(a) The party whose lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid, but there shall be no monetary liability on its part to the other parties hereto by reason of such title failure; and
(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the unit area by the amount of the interest lost, and
(c) If the proportionate interests of the other parties hereto in any producing well theretofore drilled on the unit area is increased by reason of title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such interest (less operating costs attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such wells; and
(d) Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has failed, pay in any manner any part of the cost of operation, development, or equipment, or equipment previously paid under this agreement, such amount will be proportionately paid to the party or parties hereto who in the first instance paid the costs which are so refuneded; and
(e) Any liability to account to a third party for prior production of gas and condensate which arise by reason of title failure shall be borne by the party or parties suffering the loss."
The corresponding provision of the March 15th agreement is not so explicit but it does provide for a revision of ownership interests in cases of title failure. Thus, not only was the creation of any type of fiducial relationship negatived by express provision in the two agreements but notice was taken of the possibility of one party to the agreements acquiring an interest previously held by another party to the agreement but lost due to failure of title and provision made for readjustment of participation in the proceeds. Such a provision would not have been contemplated much less included in the agreements if it was intended that a participating interest lost by title failure and acquired by another participant would inure to the benefit of the original owner.
Moreover, even assuming arguendo, that a joint adventure was created by these agreements, it is not a breach of good faith or fiducial relationship for a party to purchase an interest for his individual benefit when the agreement, as is the obvious case here, envisions that all such purchases by the parties need not be for the joint account.
Amax advances several other contentions with relation to their right to participation in the production proceeds from the Landry property. First, they argue that plaintiffs are estopped from denying the Amax interest in the 1960 lease because in the Callery operating agreement plaintiffs declared they owned no leasehold *789 interest in the Landry property when, in fact, they had acquired a top lease on that property prior to their declaration. Apart from the established rule that title to a real right cannot be established by estoppel nor can title to such a right be divested by estoppel which of itself is sufficient to dispose of this Amax contention, we note that at the time this agreement was executed plaintiffs had not yet acquired a leasehold interest in the Landry property. Their top lease by its explicit terms was subject to the uncertain suspensive condition that it would not become effective until prior leases had expired. This condition was not met and plaintiffs did not, in law, own a lease on the Landry property until November 12, 1963, when the decision in Landry v. Flaitz, supra, cancelled the prior lease. The fulfillment of this suspensive condition of the 1960 Landry lease did not occur until after Callery agreement was executed. Moreover, Amax failed to prove any reliance on this statement. The only reason for Amax to be a party to the Callery agreement in relation to the Landry property was as owner of a lease on that portion contained in the forced unit. Its participation in the agreement was certainly not based on plaintiffs assertion that it had no lease interest in the Landry property but surely on the belief that its 1957 lease was a still viable lease under which it was entitled to share in the proceeds of the forced unit.
Secondly, Amax contends that the operating agreements should be reformed by deletion of the relationship clauses which negate a joint adventure due to error on its part induced by plaintiffs. The burden to be borne by Amax to support this contention had been described thus:
"`When parties reduce their contracts to writing, and when the terms of the writing exhibit no uncertainty or ambiguity as to the nature, the object, and the extent of the agreement, it is presumed that the writing expresses the true and complete undertaking of the parties.' and that:
`Equity may reform * * * even contracts unambiguous on their face on clear proof that, through fraud or error, the written instrument has been made to express a different purpose from that which the parties had agreed on and had intended to embody therein; but to support relief there must be clear proof of the antecedent contract and of the error in committing it to writing.'" Standard Oil Co. of La. v. Futral, 204 La. 215, 15 So.2d 65, at 75.
The record before us is devoid of proof that there was error in the confection of the Callery operating agreement.
Finally, Amax argues that no accounting is due for production prior to December 17, 1963. Suffice it to say that the operating agreements are determinative of the right of plaintiffs to an accounting. In this respect, the judgment below ordered:
"* * * that there be judgment in favor of plaintiffs, Robert B. Prentice and M. H. Marr and against defendants, Amax Petroleum Corporation, R. B. Mitchell, Callery Properties, Inc. and Pan American Petroleum Corporation decreeing and ordering the said defendants to forthwith render an accounting of the proceeds of production attributable to the mineral lease described herein and accordingly to pay over to plaintiffs the proceeds of production attributable to the aforesaid mineral lease and derived from the producing units created by The Commissioner of Conservation Order No. 140-C-d dated March 28, 1960, which order created units surrounding the Oacar Hebert Estate No. 1 Well and the Leonard Simoneauz No. 1 Well, less only appropriate and applicable drilling and operating costs as may be provided for in the respective Callery Properties, Inc. and Pan American Petroleum *790 Corporation operating agreements."
The provisions dealing with failure of title in both the Callery and Pan Am operating agreements provide that in the case of title failure adjustment of expenses and revenues will not be made retroactively but will take place from the date that the title failure is finally determined. This final determination occurred in this case on December 16, 1963, the date the Supreme Court refused a rehearing in Landry v. Flaitz, supra. Therefore, defendants are required to make an accounting only for the period commencing December 17, 1963. This, we feel, is the import of the judgment below.
For the foregoing reasons the judgment rendered by the trial court is affirmed at appellants' costs.
Affirmed.