Statement of the Case.
MONROE, J.
Plaintiffs sue the Scott Lumber Company, Limited, as a commercial firm, and certain named individuals as the members thereof, on several promissory notes, signed “Scott Lumber Co., Ltd., per E. D. Carter, Manager,” which were ac•quired, partly in renewal of other notes, and partly for lumber sold, and upon an account alleged to have been acquired by assignment from another concern. The defense, ■stated in substance, is that the Scott Lumber Company, Limited, was a corporation de facto et de jure; that plaintiffs dealt with it as such; and that they cannot now fasten the liability contracted by it on defendants, who acquired stock in said corporation and paid for it, in good faith and in the assured belief that, beyond the amount so paid, they could not be held liable for the corporate debts.
The facts disclosed by the evidence are that, in 1906 and prior thereto, Ike Scott and M. E. Regan, as also G. W. Regan, the wife of M. E. Regan, were engaged in the lumber business at Ruston, and dealt to a •considerable extent with plaintiffs and with ■a firm of which plaintiffs are the successors. In August, 1906, they attempted, under Act No. 78 of 1904, to convert their partnership (so called) into the corporation called the Scott Lumber Company, Limited, Scott and M. E. Regan signing the charter for themselves, and M. E. Regan signing for G. W. Regan, without, however, upon the face of the instrument disclosing that G. W. Regan is his wife. The capital of the corporation was fixed at $15,000, divided into 150 shares of $100 each, and the charter contains a provision that no stock shall be issued save for a consideration, in cash, property, rights, or credits, actually received; another, to the effect that the corporation shall be authorized to commence business when 50 per cent, of the stock shall have been subscribed and paid for; and still another (the usual clause) exempting stockholders from liability beyond their unpaid subscriptions. The charter was prepared by a reputable attorney, employed for that purpose, signed before a notary public, approved by the district attorney, recorded in the mortgage office, and published, during 30 days, in a Ruston newspaper.
The attorney also gave instructions that the proper record should be made in the office of the Secretary of State, but that was not done. The parties turned over to the corporation (or supposed corporation) money and machinery, and, perhaps, other assets, to the value of $5,500, in payment for stock to that amount which was issued to them, and sometime later caused themselves to be credited with profits, supposed or assumed to have been earned, to the amount of $4,500, for which additional stock was issued. The method of arriving at the dividend thus declared having been, as we understand, to appraise the stock on hand and outstanding accounts and to base the dividend on the appraisement ; a method which left a good deal to be desired in the way of certainty, though there is no doubt that the assets of the company had by that time somewhat increased in value. In the meanwhile, and thereafter, the company seems to have done a good deal of business, and W. E. Bond, one of the plaintiffs, says in his testimony, that Scott and Regan managed the business and that Regan signed the checks, and his testimony proceeds, in part, as follows:
“Q. He paid you a good deal of money? A. Yes, sir; we sold him a heap of lumber. *821 * * * I think Regan was the secretary treasurer. Q. You knew that Ike Scott was president, didn’t you? A. No; I didn’t pay any attention to it. Q. Who did you think was president? A. I didn’t inquire. Q. You knew that, in dealing with this corporation, that a stockholder was not liable for the corporation’s -debts; did you not? * * * A. I always thought so. * * * Q. In none of those dealings, you did not consider that you were dealing with a commercial partnership in any of your dealings with this corporation, did you? A. I don’t think I did.”
In that situation, whilst plaintiffs were ■dealing with the company as a corporation, and the corporation had become their debtor for a part (though, for how large a part, no ■one seems to know) of the debt here sued for, Scott and Regan succeeded in finding some business men in Ruston who were willing to buy them out, and some of the defendants now before the court bought, at par and for ■cash, $5,000 of the stock that was owned or controlled by the Regans, while others bought, at 80 per cent, also for cash, $5,000 that was owned or controlled by Scott, and an extra share was sold from the reserve ■of the company for $100 in cash. That occurred in May, 1907, and ■ very soon after-wards there came a stringency (or panic, as some of the witnesses say) in the money market, with falling prices for lumber, as a result of which the company appears to have 'done bad business, and finally, say, in June, 1909, went into the hands of a receiver owing some $16,000, and showing assets which were appraised, at first at $4,886.65, and then .at $2,845.65, and were sold for about $1,500.
It appears to have been discovered about ■that time (after the appointment of the receiver) that the charter of the company had not been recorded in the office of the Secretary of State; hence this suit. But the -evidence is conclusive to the effect that the present defendants knew nothing of that when they bought their stock, or, in fact, until after plaintiffs had made the discovery, and that they, and those who dealt with them, including plaintiffs, had prior to that time believed that all the legal requirements had been fulfilled. None of the plaintiffs, so far as this record shows, were aware of the fact that one of the three incorporators was the wife of another one, and it is quite likely that, if they had known it, the information would not have suggested to them the idea that the corporation was any the less valid on that account.
Opinion.
On the facts stated, the judge a quo gave judgment against the defendant company as prayed for, and rejected plaintiff’s demand as to the other defendants. Plaintiffs alone have appealed, and the question which they present is, Are they entitled to hold the other defendants liable in solido with ■ the company?
[1] We think not. Mr. Bond (of the plaintiff firm), as we have seen, frankly admits that the business out of which this litigation has arisen was based upon the understanding upon his part that he was dealing with a corporation, the stockholders of which did not become individually liable for the obligations incurred by the corporation, and the defendants testify, in effect, that such also was their understanding. That being the case, to hold that defendants are so liable would be, not only to set up and enforce a contract which neither they nor the plaintiffs ever entered into or ever intended to enter into, but to enforce a liability which, according to the contract which they did enter into, was not to be incurred, a thing which could not be done even if defendants had transacted the business as commercial partners; and it may very well be questioned whether, for the purposes of their defense, it is necessary that they should show that the corporation in question acquired even a de facto existence.
“The doctrine in. regard to estoppel” (says a late writer) “is based upon the ground that it would generally be inequitable to permit the *823 corporate existence of an association to be denied by persons who have represented it to be a corporation, or held it out as a corporation, or by 'persons who have recognized it as a corporation by dealing with it as such; and, by the overwhelming weight of authority, therefore, a person may be estopped to deny the legal incorporation of an association which is not even a corporation de facto.” Marshall on Corporations, p. 188.
“The estoppel of one who has dealt with a corporation is not, necessarily, limited in its operation to eases in which an action is brought against or by him on the contract, but also applies in many other cases. Thus it has been held that one who has dealt with a pretended corporation and become its creditor is estopped to deny its incorporation for the purpose of attacking an assignment made by it for the benefit of its creditors or for the purpose of attacking bonds and mortgages previously given by it.” Ib. p. 133.
Another author says:
“If an association undertakes to enter into a contract as a corporation, it is clear that the members of the association do not agree to be bound as partners, either to each other or to the parties contracting with the association. It is equally clear that the party contracting with the association does not intend to contract with its members individually. To treat the individual members as parties to the contract under these circumstances, would therefore not only involve the nullification of the contract which was actually contemplated by the parties, but the creation of a different contract which neither of the parties intended to make.” Morawetz on Private Corporations, § 748.
In a case decided by this court, plaintiffs sought to hold the members of a supposed corporation liable individually and as partners, on the ground that the corporation was not legally established, and it was held (quoting from the syllabus):
“There was not a partnership liability of stockholders even if, as contended by plaintiffs, the corporation of which the defendants were stockholders was a defective and illegal corporation, for the reason that the plaintiffs had notice of the stipulation to secure limited liability of the stockholders and contracted their debt with reference to the limited liability of three of the defendant stockholders.” Sentell & Co. v. J. E. Hewitt et al., 50 La. Ann. 3, 22 South. 970.
[2] Apart from the considerations thus expressed, the law, in force when the business out of which this suit has arisen was transacted, must be read into the contract sued on.
Act No. 78 of 1904, under which, more especially, the defendant company was incorporated, provides:
“Section 1. * * * That any three or more persons may, on otherwise complying with the requirements of the laws of this state, form corporations * * * to carry on any business specified in the charter that would be lawful for-any individual to carry on * * * provided such corporation shall have a subscribed capital of not less than three thousand dollars.
Sec. 2. * * * That wherever parties have attempted to form a corporation and have executed, recorded and published the charter, all contracts made and acts done by such corporation shall be treated as the contracts and acts of valid corporations so far as affects the rights and obligations of the corporation and its shareholders, reserving, however, to the state the right to take such proceedings as may be authorized by law to enjoin or dissolve said corporation if informal, or to compel the compliance by them with the requirements of the law in the formation of corporations.”
Section 3 provides that the act shall not apply to corporations established for insurance or banking or to such as may exercise the power of eminent domain.
Section 4 repeals all conflicting laws.
As was said in a case recently decided by this court:
“Section 2 of the act of 1904 is a legislative recognition of the general'rule, with few exceptions, that no one can question the regularity of the incorporation, except the state, where the statutes allow incorporation and the company has_ endeavored to incorporate and is actually acting as a corporation'. Cook on Corporations (6th Ed.) par. 5.” Leader Realty Co., Ltd., v. Lake View Land Co., 127 La. 1059, 54 South. 350.
The learned counsel for plaintiffs argue that the case presented by defendants does not fall within the statute thus quoted, because (they say) (1) there has been no attempt, in this instance, to form a corpora-' tion, inasmuch as one of the three parties to the alleged attempt was the wife of one of the others, and was incapable of making such an attempt; (2) the charter and proof of publication of same were not filed in the office of the Secretary of State; (3) the amount required as the capital of the pretended corporation was not actually paid.
*825 It is quite evident that, if there had been no mistakes, omissions, irregularities, or defects in the proceedings, the result would have been a perfect de jure corporation, to which section 2 of the act of 1904 would have no application. That section is, however, intended to apply in eases where there have been mistakes, or omissions, and where the law has not been complied with, and it applies (to quote the language) “wherever parties have attempted to form a corporation and have executed, recorded, and published the charter.”
It does not define the “attempt” to which it refers, and it may be, perhaps, that an attempt by a number of persons, all, or a majority, of whom are incapable of forming a corporation, would not fall within the meaning intended. But that is not this case. Two of the persons who signed the charter of the defendant company were capable of establishing a corporation, and they undertook to do so, by legal advice.
If the third person who was associated with them in the undertaking was incapable, there was no legal corporation, but it can hardly be said that there was no attempt to establish one; the more particularly when we consider that the charter, as thus executed., was recorded in the office of the recorder of mortgages and published according to law, and that there was a subsequent user, in apparent good faith, of the corporate franchise.
Act No. 59 of 1898, on which plaintiffs rely to support the proposition that corporate existence does not begin until the charter and proof of publication have been filed in the office of the Secretary of State, does not, in our opinion, bear the interpretation thus placed on it. It does not concern itself with the establishment of corporations, but applies (with certain exceptions) to “all corporations * * * hereafter doing business.” Upon the other hand, the recording, referred to in section 2 of the Act of 1904, is the recording, in the .mortgage office, required by R. S. § 686, or other provisions of law, as a condition to the establishment of a corporation.
The remaining point relied on by plaintiffs is equally without support. Act No. 86 of 1888 may, perhaps, be open to the construction that the capital of corporations established under its authority must be actually paid in, since it provides that such corporations “shall have a capital stock of not less than $5,000.” Act No. -78 of 1904 provides that corporations established pursuant to its provisions “shall have a subscribed capital of not less than $3,000,” or, in other words, as we interpret the language used, shall have subscriptions to the capital stock of not less than $3,000, which subscriptions the defendant company appears to have had. If, however, it should be shown that the amount subscribed fell short, by reason of the incapacity of a subscriber, such irregularity would not operate to deprive the stockholders of the shield provided by the Statute.
No one is here complaining of the judgment which has been rendered by the district court against the' defendant company, and, as we find no error in the judgment against the other defendants, the judgment appealed from is affirmed.