Statement of the Case.
MONROE, J.
Plaintiff alleges that it leased a store building, No. 155 Baronne street, in this city, to S. A. Chapman & Co., a commercial copartnership composed of Stephen Chapman, Robert H. Shaw, and Harry C. Quirk; “that it has been informed that said parties attempted to organize a corporation, under the name of S. A. Chapman & Co., Ltd., but * * * that, if any such attempt was made, the same was futile and inoperative; * * * that said lease did not purport to be signed by said corporation; and that the parties herein-above named are, in law, and in fact, commercial partners; * * * ” and, further alleging a default in the payment of the rent, it prays that certain property be provisionally seized and for judgment against said partnership, and its members, in solido, for the full amount called for by the lease, say $9,900, with interest, attorney’s fees, etc.
Shaw and Quirk, after excepting, answered that they had never been members of any such firm as that mentioned, but had been stockholders in a corporation known as S. A. Chapman & Co., Ltd.; that S. A. Chapman, by whom the lease sued on purports to have been signed, was not authorized by the corporation to sign it, but that the corporation had occupied part of the leased premises; that plaintiff well knew that S. A. Chapman & Co., Ltd., was the only party intended to be bound, as lessee; knew that it was a corporation and dealt with it as such and is estopped to assert the contrary. Quirk died, after answering, and his administrators were made parties defendant, in his stead. S. A. Chapman was not cited, made no appearance, and is said to have absconded.
It appears, from the evidence adduced and the admissions made on the trial of the case, that, Chapman, Quirk, and Shaw, having agreed to form a corporation, and having taken legal advice upon the subject, appeared before Bernard J. Daly, a notary public in this city, on November 19, 1908, and signed a notarial act, or charter, purporting to establish a corporation to be shown as “S. A. Chapman Company, Limited,” for the purpose of conducting the business of general merchant tailoring and dealing in cloth and clothing, etc. Article 4 of said charter provides for a capital stock of $10,000, divided into shares of $100 each, and, further, that—
“the corporation shall become a going concern and be authorized to do business as soon as $1,500 of its capital stock shall have been subscribed and paid for.”
Article 6 provides for the election of officers, and that, until such election, Chapman, Quirk, and Shaw shall constitute the first board of directors, and that Chapman shall be president, Quirk vice president, and Shaw secretary and treasurer. Article 10 provides *565 that no stockholder shall be liable for the contracts of the corporation beyond tbe unpaid balance of bis subscription—
“nor shall any informality in organization have the effect of rendering this charter null or exposing a stockholder to any liability beyond such unpaid balance, if any.”
Chapman, in signing the charter, subscribed and paid for 10 shares of the stock of the corporation; Quirk, for 5-shares; and Shaw, for 5 shares. The charter was duly recorded and published, and the concern subleased the upper part of the building No. 157 Baronne street, one of a row, or block, of which No. 155 is another, and the adjoining one, and the whole of which belongs to the plaintiff. There was a sign placed at the street entrance of the premises so occupied, bearing the inscription, “S. A. Chapman Company, Ltd.; Merchant Tailors,” and accounts were opened in banks, checks were drawn, and business, generally, was conducted in that name. Whilst matters were in that condition, some time prior to June 2, 1909, Chapman negotiated the lease (of the adjoining building, No. 155) here sued on, through Mr. A. H. Dicks, an insurance and real estate agent, who testifies that Chapman came to him in search of new quarters and, after considering one or two other places that were suggested, agreed to take the building in question, and signed the lease and rent notes therefor, as they had been prepared upon forms furnished and filled out by him (Dicks); his testimony upon the subject reading, in part, as follows:
“Mr. Chapman took up the matter with me and asked me to get him a building. * * * So we took up the question of the building on Baronne street, * * * and it was rented to him. * * * Mr. Chapman wanted me to make my commissions out of the landlord, you understand, but my negotiations were all with him. * * * The Tulane people paid me. * * * I went to those people, and I said to them, ‘If I lease this building for you, I suppose you are willing to pay me the commission,’ and they said that would be all right. Of course, I looked to them for my commission for making the deal.”
He also testified that he had, previously, had dealings with the Chapman concern-had effected insurance for, and bought clothes from, it, etc., and his testimony proceeds :
“Q. As a matter of fact, to your knowledge, S. A. Chapman & Co., Ltd., were doing business in that same building, upstairs, were they not? A. They were doing business in the corner building, upstairs; that was next door. Q. But in the same block? A. Yes, sir; in the same block. Q. Owned by the same people, was it not? A. Yes, sir. Q. Right next door to this place? A. Yes, sir. Q. You knew they were doing a tailoring business up there, did you not? * * * A. Certainly, I knew it; I bought a suit of clothes from them. Q. Did you ever see the sign there: ‘S. A. Chapman & Company, Limited’? A. Well, I really don’t remember about S. A. Chapman &“ Company, Limited ; of course, I knew that it was S. A. Chapman & Co., a firm. * * * Q-. Now, I wish you would kindly look at this sign (indicating a large sign which had been brought into the courtroom). I show you the sign, * * * and ask you to state whether or not you ever saw that sign at the place of business of S. A. Chapman & Co., Ltd.? A. I wouldn’t be at all surprised if I did see it there. Q. That was at the bottom of the stairs? A. It may have been there; yes, sir.”
Tbe witness was then shown two checks, payable to his order, one, dated May 20, 1909, signed: ‘^S. A. Chapman & Co., Ltd., S. A. Chapman, President; R. H. Shaw, Secretary” — and one, dated March 28, 1910, signed: “S. A. Chapman & Co., Ltd., S. A. Chapman, Pres.” And he identified both of them as having been received and collected by him, and his testimony, again, proceeds:
“Q. Mr. Dicks, you stated that you bought a suit of clothes from S. A. Chapman & Co., Limited? A. Yes, sir. * * * Q. Have you got the bill for that suit of clothes? A. I don’t remember whether I have or not. You asked me, once before, at my office, if I had that bill, but I couldn’t find it, on that day. I showed you the stub of my check book at that time; but I can’t say, positively, whether I have the bill or not. Q. But you do not contend, do you, that you did not know that these people were doing- business under the name of ‘S. A. Chapman & Co., Limited,’ at the time the lease was made; you don’t contend anything like that, do you? Q. Well, I -didn’t pay very much attention to that, as far as that is concerned. Q. I show you the lease again, Mr. Dicks, of date January 2, 1909 (handing document to witness). A. When he signed the lease, of course, I nat *567 arally supposed that it was signed in the proper shape. I knew that he was president of the company, and I took it for granted that he was signing the document correctly. Q. You knew that he was president of this Chapman concern? A. He signed it ‘President,’ that way. I presumed that was correct, because I never had any reason to doubt it. Q. Now, as I understand you, the lease was filled in, on the typewriter, in your office? A. Yes, sir. Q. And under your directions? A. Yes, sir. * * * Q. Didn’t you know that S. A. Chapman •& Co., Ltd., were doing a banking business with another bank, and didn’t you go to them and solicit their business for your own bank, the City Bank & Trust Company? A. Yes, sir; I asked them to give the City Bank & Trust Company their account. Q. You knew that S. A. Chapman & Co., Limited, did business with the Citizens’ Bank & Trust Company, didn’t you? A. I knew they did business; yes, sir. Q. I will show you a bank book, Mr. Dicks, * * * and ask you to state whether or not that is the bank book and that is the firm? A. Yes, sir; that is correct, because I took Mr. Chapman over there, myself, and introduced him. * * * Redirect, by counsel for plaintiff: Q. Mr. Dicks, you speak of this lease as having been signed by Mr. Chapman, ‘President.’ You don’t mean 'to say that you read any such thing on the lease, yourself, do you (handing document to witness)? * * * A. Yes, I see it, now; I see that it refers to the Tulane Improvement Company. * * * And you can see it refers to Mr. Sam Henderson? A. Yes, sir; that is correct.”
The facts, in that connection, are, that, in the body of the lease, as prepared by Mr. Dicks, the name of the lessee is given as “S. A. Chapman & Co.” The instrument is, however, signed, “S. A. Chapman Co., per S. A. Chapman.” The rent notes are signed “S. A. Chapman & Co., per S. A. Chapman.” On the other hand, the name of the Chapman concern, as given in the charter, is “S. A. Chapman Company, Limited,” and that, as we have stated, is the name that appeared upon the sign to which the witness refers and which appeared upon the checks which were given to, and collected by, him. That, in preparing the lease, he should have had typewritten, in the body of it, the name ‘‘S. A. Chapman & Co.,” and should have allowed Chapman to sign “S. A. Chapman Co., per S. A. Chapman,” was, apparently, inadvertent, since he knew that the concern with which he was doing business was “S. A. Chapman Company, Limited,” and there is nothing in his testimony to indicate that he was led into the error by anything that was said or done by Chapman, and still less, by Quirk or Shaw, who knew nothing of what was going on. That Chapman should have signed the lease as he did is not so surprising. 1-Ie was a tailor, and not a real estate agent or a lawyer.
Mr. Henderson, the president of the plaintiff company, seems to have been under the impression, at the time of the negotiation and signing of the lease, that he was dealing with a commercial firm; but we .fail to find that either Chapman, Quirk, or Shaw were, in any wise, responsible for that impression. His testimony upon the subject reads, in part, as follows:
“I can say that I never saw Mr. Chapman, át all, in connection with the leasing of those premises to him, until after we had arrived at the terms of the lease. That is to say, it was Mr. Dicks who carried on all the negotiations on behalf of these people. I did not know Mr. Chapman in the matter, at all, until afterwards. * * * Q. Mr. Henderson, tell the court just what passed between you and Mr. Dicks with reference to the making of this lease. A. Well, we finally agreed upon the terms, and then 1 took up with him the solvency of the concern, and the question of surety, and he told me that it was a firm, composed of Mr. Chapman, Mr. Quirk, and, I think, Mr. Shaw — the three. I knew Mr. Quirk, and I thought him to be a man of considerable means. * ® * Now, after I had named the price, I think Mr. Chapman called at my office, with Mr. Dicks, and discussed the question with me of leasing the premises, and I was led to believe that it was the firm of Chapman & Co., and that Mr. Quirk was a partner in that firm.”
It will be observed that the witness is, apparently, not altogether certain that Chapman called on him at all, and he fails to say that he was led by him or by Quirk or Shaw, to believe that they were partners; nor does he say that he would not as readily have rented the property to the corporation as to the supposed firm. He further testifies that he did not know that “S. A. Chapman Company, Ltd.,” had been subtenants of the upper floor of the building No. 157; but he *569 does not deny that there could have been no sublease without the consent of the owner of the building. He says that the notes given in conformity to the lease were deposited in bank for collection, and it otherwise appears that three of them were paid by checks signed “S. A. Chapman & Co., Ltd.; S. A. Chapman, Pres.” — though it does not appear that the witness saw those checks. At the time to which the witness refers when he says,. “I think Mr. Chapman called at my office,” etc., neither the lease nor the rent notes had been executed; but, as they were executed on June 2d, and the tenant was not to go into possession until the following October, there is no reason to suppose that he did not see them long before that time, and, if he did, he could not have failed to notice that the tenant, named in the body of the lease, was S. A. Chapman & Co., a name which might be borne by either a partnership or a corporation, for the law declares that corporations may be formed, “under any name given in the charter” (Act No. 78 of 1904, § 1); nor could he have failed to notice that the lease was signed “S. A. Chapman Co., per S. A. Chapman,” and that the notes were signed “S. A. Chapman & Co., per S. A. Chapman,” which would have been unusual, if the signatures had been intended as those of a commercial firm, affixed by one of its members. Upon the facts stated, there was judgment in the district court in favor of defendants, and plaintiff has appealed.
Opinion.
[1] It is plain that Chapman, Quirk, and Shaw never intended to form a partnership, but that they intended to establish a corporation, and thereby bring themselves within the law which exempts stockholders from liability for corporate debts, save to the extent of the unpaid balances of their stock subscriptions. We think it equally plain that they never held themselves out as partners. On the contrary, they transacted their business, openly and publicly, in a corporate name, and Mr. Dicks had abundant reason to know, and admits that he did know, that they were so doing, and it was he who was responsible, and not they, for the error that was committed in failing to have the contract sued on made in that name. Mr. Dicks, as we have seen, was approached, in his capacity of real estate agent, by Chapman, who was looking for a store; but Chapman gave him to understand that he was to get his commission from the owner, which was as much as to say that he regarded him as the representative of that interest, and Mr. Dicks, himself, says:
“The Tulane people paid me. * * * . I went to those people, and I said to them: ‘If I lease this building- for you, I suppose you are willing to pay me the commission.’ And they said that would be all right. Of course, I looked to them for my commission for making the deal.”
[2] We are therefore of opinion that the “Tulane people” are to be charged with Mr. Dicks knowledge, and with his errors, in making the deal thus referred to, and are to be held to have known that Chapman was acting for other people who were doing business as a corporation; and, that being the case, that they (the “Tulane people”) are now estopped to assert the contrary. A similar question was recently considered by this court, and it was held (quoting from the syllabus of the case, as reported):
“Where, in a suit brought by creditors of a supposed corporation, in which they seek to make the stockholders liable, individually, as commercial partners, it appears that the business out of which the suit arises was transacted with the understanding, on the part of the plaintiffs as well as the defendants, that plaintiffs were dealing with a corporation, the stockholders of which did not become individually liable for the obligation incurred by the corporation, to hold that the defendant stockholders are so liable would be, not only to set up and enforce a contract which neither they nor the plaintiffs ever entered into or intended to enter into, but to enforce a liability which, according to the contract that they did enter into, was not to be incurred — a thing which could not be *571 done even if defendants had transacted the business as commercial partners.” Bond & Bras-well v. Scott Lumber Co., 128 La. 818, 55 South. 46S.
Among the authorities quoted in support of the proposition thus stated is the following:
“The doctrine in regard to estoppel is based upon the ground that it would generally be inequitable to permit the corporate existence of an association to be denied by persons who have represented it to be a corporation, or held it out as a corporation, or by any persons who have recognized it as a corporation by dealing with it as such; and, by the overwhelming weight of authority, therefore, a person may be estopped to deny the legal incorporation of an association which is not even a corporation de facto.” Marshall on Corporations, p. 138.
The view expressed appears to us to he applicable to the case now under consideration. The defendants invested $500, each, which they were willing to risk, in the capital stock of what, with the assurance of legal advice and in good faith, they believed to be a legally constituted corporation. The survivors and the succession of the other are now called on to pay $9,500, which it may very well be that they are wholly unable to pay, or to lose; and, this, notwithstanding that the plaintiff corporation, which is claiming the money, knew, or was in a position to know, and must be presumed to have known, that, in the transaction out of which the claim arises, defendants were represented by the supposed corporation in which they had made their investment and the existence of which was considered sufficient to protect them againsc loss beyond the value of the stock for which they had subscribed and paid. To allow such a claim would be to give to one of the parties, and to impose upon the other, something that was not within the contemplation of their contract, and thereby to work great injustice, and, as the author quoted says, the overwhelming weight of authority is against it.
The judgment appealed from is therefore affirmed.