365 So.2d 269 (1978)
William A. SMITH, Ditta Investments Inc., John E. Boullt, and A. M. Camp, Plaintiffs-Appellants,
v.
WEST VIRGINIA OIL & GAS CO., et al., Defendant-Appellee.
No. 13661.
Court of Appeal of Louisiana, Second Circuit.
October 30, 1978.
Rehearing Denied December 13, 1978.[*]
Writ Granted February 9, 1979.
*270 William A. Hargiss, Monroe, for plaintiff-appellant.
Oliver & Wilson by C. McVea Oliver, Monroe, for appellee.
George M. Wear, Monroe, for sublessees.
*271 Before PRICE, MARVIN and JONES, JJ.
JONES Judge.
Plaintiffs, William A. Smith; Ditta Investments, Inc.; A. M. Camp and John E. Boullt, appeal an interlocutory judgment rejecting their application for a preliminary injunction enjoining defendant, West Virginia Oil and Gas Company, Inc. from constructing a gas pipeline on plaintiff Ditta's property, and alienating gas from plaintiffs' property.
The four plaintiffs own the minerals on separate tracts of land totaling 160 acres depicted by diagonal lines on the plat below.
Smith_ _ _ _ _ _ _ W-― of SW- of NW-
Ditta Investments- E-― of SW- of NW-
 NW- of SW- less
 North 60 feet of W-―
Boullt_ _ _ _ _ _ _ NE- of SW-
Camp _ _ _ _ _ _ _ SE- of SW-
All plaintiffs own the surface and minerals except Camp who owns the minerals only, having sold his tract with a reservation of minerals in 1969.

In 1919 West Virginia Timber Company granted a mineral lease covering 19,000 acres to Henry Bernstein. The lease contained no primary term, but required the lessee to drill five wells. The first well was required to be commenced within 90 days of the execution of the lease. At least one succeeding well was required to be started within 60 days of the completion of each former well until the total of five wells had been drilled. Each producing well would earn a lease on approximately 3000 acres surrounding it and the lease would continue as long as minerals were produced in paying quantities.
On March 12, 1920, Henry Bernstein assigned the lease insofar as it was applicable to approximately 2800 acres to West Virginia Oil and Gas Company, Inc. The 160 acres owned by the plaintiffs were included within the acreage assigned. On October 14, 1929, the successor of Henry Bernstein, lessee, assigned the lease insofar as it was applicable to approximately 245 acres to ShoVan Producing Company, Inc. Neither of these acts of assignment contained any overriding royalty nor any control of the assigned acreage nor was there any requirement that the assignee drill any wells on the assigned acreage.
*272 On January 16, 1945 a Stipulation and Transaction of Compromise was executed in the matter styled "George Breece Lumber Company, Inc., et al. v. West Virginia Oil and Gas Company, Inc., et al. on the docket of the U.S. District Court for the Western District of Louisiana wherein the owners of the property subject to the Bernstein lease and the current owners of the lease in settlement of the litigation cancelled the lease except insofar as it affected approximately 1000 acres of the leased acreage. The acreage retained subject to the lease included a portion of that assigned to West Virginia and the acreage assigned to ShoVan, and 80 acres assigned to Union Producing Company. The language of the stipulation and transaction of compromise with regard to the West Virginia and ShoVan acreage which remained subject to the lease is as follows, to-wit:
"2. It is stipulated and agreed that the West Virginia Oil and Gas Company, Inc., by adequate development pursuant to the terms of the mineral leases from the West Virginia Timber Company and/or George Breece to Henry Bernstein, has earned a lease (which is hereby ratified, confirmed and acknowledged so long as oil or gas is produced and marketed therefrom) on the following described land:
T 18 NR 4E
Sec. 5 - W-―
Sec. 8 - N-― of NW-
T 18 NR 5E
Sec. 3 - E-― of NW-
Sec. 3 - NW- of SW-
Sec. 4 - NE-
3. It is stipulated and agreed that the ShoVan Producing Company, Inc., by adequate development pursuant to the terms of the mineral lease from the West Virginia Timber Company and/or George Breece to Henry Bernstein, has earned a lease (which is hereby ratified, confirmed and acknowledged so long as oil or gas is produced and marketed therefrom) on the following described land:
T 18 NR 4E
Sec. 8 - Lots 2, 3, 4, 5
 SW- of NE-
Sec. 7 - Lots 1, 2, 3
Sec. 6 - Lot 11"
This compromise agreement was incorporated in a final decree of the court by judgment rendered in the matter on May 9, 1945. The compromise reduced the 2800 acres received by West Virginia in the assignment from Bernstein to approximately 680 acres and provided the lease would continue "so long as oil or gas is produced and marketed therefrom."
West Virginia drilled numerous producing wells upon the leased premises but all wells had ceased to produce prior to 1977 with the exception of one well located on the N-― of the NW of Section 8 shown on the plat as West Virginia well No. 8. This well stopped producing entirely in November of 1977 because of a gas leak in the line. This leak was only repaired and production resumed on March 10, 1978. This well only produced 6599 MCF of gas during 1977 and the gas was sold by West Virginia at the rate of 9Ē per MCF pursuant to a gas contract then in force. The well under these circumstances produced gas in 1977 valued at $593. Expenses related to the upkeep of the well in 1977 were $1,592.07. There was no evidence that the production of the well following the repair of the leak in the line would be any better than it had been during the year 1977.
In 1974 West Virginia entered into a farmout agreement to sublease to Roy M. Teel, after such time as Teel had drilled and completed wells commercially producing gas on the leased tract.[1] In September and October of 1977, Teel and his assignees, in an effort to earn the sublease under the farmout agreement, drilled one well on each of the four plaintiffs' property which are reflected by squares on the plat. These wells are capable of producing gas but have never been placed in production.
*273 On December 13, 1977, plaintiffs Ditta and Smith made demand by letter upon defendant for an act reflecting that the lease had terminated for failure to produce in paying quantities. Plaintiff Boullt wrote a similar letter demanding cancellation of the lease on December 21, 1977 and plaintiff Camp wrote such a letter on February 11, 1978. Defendant did not respond to the demand for cancellation and on March 1, 1978 plaintiffs filed this suit to cancel the West Virginia lease for cessation of production, failure to produce in paying quantities, and for damages for drainage. On that date, Herbst (Teel's assignee) wrote Ditta advising it he intended to construct a pipeline along the east boundary of Ditta's property for the purpose of connecting the newly drilled gas wells to a meter station of the City of Monroe with whom he had entered a contract to sell the gas contemplated to be produced from the new wells. Upon receipt of this letter, plaintiff amended his suit and sought a temporary restraining order (which was granted), a preliminary injunction and thereafter a permanent injunction enjoining West Virginia and all persons acting upon their behalf from the construction of the pipeline and production of the gas from the recently drilled wells on plaintiffs' property. Plaintiffs initially sued West Virginia as an unincorporated association, but thereafter on March 10, 1978 amended their petition alternatively suing West Virginia as a corporation.
On November 22, 1977 West Virginia executed a sublease to Roy M. Teel which covered the plaintiffs' property. This sublease was not recorded until January 26, 1978 and there was no evidence that notice of the sublease was ever sent to plaintiffs as contemplated by LSA-R.S. 31:132.[2] Under these circumstances, plaintiffs were not required to make demand upon the sublessee or his assignee.
Following the trial of rule for preliminary injunction, the trial judge dismissed the plaintiffs' suit against West Virginia as an unincorporated association, found that plaintiffs had failed to establish that they were entitled to have the lease cancelled or that they would suffer irreparable damage by virtue of the construction of the pipeline and production of gas, and for these reasons terminated the TRO and denied the preliminary injunction. The trial court refused to hold defendant in contempt for clearing the right-of-way for the pipeline after the issuance of the TRO, but prior to service upon the defendant, and ordered plaintiff to join indispensable parties.
The issues on appeal are: (1) were plaintiffs entitled to a preliminary injunction to protect their property rights? (2) are plaintiffs estopped from asserting cancellation of the lease? (3) did plaintiffs establish irreparable injury sufficient to justify issuance of a preliminary injunction? (4) was the suit against West Virginia as an unincorporated association properly dismissed? (5) was trial court correct in refusing to hold defendant in contempt for clearing right-of-way for pipeline after the issuance of the TRO but before it was served with it? and (6) do plaintiffs have the right of appeal from the trial court's judgment ordering plaintiffs to join indispensable parties?

PRELIMINARY INJUNCTION
C.C.P. Article 3601 provides: "An injunction shall issue in cases where irreparable injury, loss, or damage may otherwise result to the applicant, or in other cases specifically provided by law." A preliminary injunction is available for the protection of ownership, possession or enjoyment of property. C.C.P. Article 3663.[3]Bagents *274 v. Crowell Long Leaf Lumber Co., 20 So.2d 641 (La.App. 1st Cir. 1945); Moorhead v. State Through the Department of Highways, 322 So.2d 330 (La.App. 2d Cir. 1975).
A plaintiff does not have to prove irreparable injury when he seeks to enjoin defendant from a course of action forbidden by law. Whalen v. Brinkman, 258 So.2d 145 (La.App. 1st Cir. 1972).
In Marrero Land & Improvement v. Duplantis, 221 La. 540, 59 So.2d 829 (1952) plaintiff proved he owned the property and the court enjoined defendant who had constructed canals on plaintiff's property from interference and trespass to plaintiff's property.
In Nomey v. State of La., Department of Highways, 325 So.2d 732 (La.App. 2d Cir. 1976) plaintiff produced evidence he owned this property, while defendant produced no evidence of the existence of servitude. The court held plaintiff had established a prima facie case and issued a preliminary injunction prohibiting defendant from doing construction work on plaintiff's property.
The plaintiff is required to establish a prima facie showing that he is entitled to a preliminary injunction. Schwegmann Brothers Giant Super Markets v. Louisiana Milk Commission, 290 So.2d 312 (La.1974); Employers Overload v. Employers Overload Co. of New Orleans, 266 So.2d 546 (La.App. 4th Cir. 1972) and Moorhead v. State, supra.
The trial court found the plaintiffs had established at the hearing on the preliminary injunction that they owned the minerals under the 160 acres on which they sought to have the defendant's lease cancelled. There is ample evidence in the record to support this finding. The defendant made no attempt to establish that the minerals claimed by the plaintiffs were owned by others. We find the record established a prima facie case that the minerals were owned by the plaintiffs.
The lessor's royalty computed upon an annual total production of $593 would amount to only 21Ē per day for gas produced from the only well on the leased premises during the year 1977 and the maintenance of the well required the expenditure of $1,507.92. Under these circumstances LSA-R.S. 31:124[4] requires the conclusion that there was no production and marketing of minerals from the leased premises in paying quantities. See Parten v. Webb, 197 La. 197, 1 So.2d 76 (1941) where royalty averaging less than 50Ē per day was considered not to be production in paying quantities.
The defendant offered no evidence of any production from its acreage other than that above described. The defendant attempts to establish that its lease is producing in paying quantities by proving that the acreage included in the original Bernstein lease agreement and assigned to Sho-Van was producing in paying quantities. There is sufficient evidence in record from which it could be concluded that the Sho-Van acreage was producing in paying quantities.
The production on this acreage cannot be considered for the purpose of determining whether West Virginia's lease is producing in paying quantities. The Bernstein lease was effectively divided by the compromise agreement executed between the owner of the land subject to the lease and the owners of the lease on January 16, 1945 which was incorporated in the federal court judgment of May 9, 1945.
In the decision of Smith v. Sun Oil Co., Inc., 165 La. 907, 116 So. 379 (1928), the court stated that an assignment by the lessee wherein he assigns a portion of the *275 acreage included within the lease to another without retaining any overriding royalty, or without otherwise placing any obligation on the part of the assignee with regard to the acreage so assigned, has the effect of dividing the lease, when the original lease contains an agreement between the lessor and lessee permitting the division of the lease. Thereafter, production on the assigned portion of the land cannot be considered as production upon that portion of the original lease not included within the assignment.
In the decision of Roberson v. Pioneer Gas Co., 173 La. 313, 137 So. 46 (1931) the rational of Smith v. Sun Oil was followed. The assignor retained no overriding royalty nor did he require the assignee to drill a well nor did the assignor otherwise retain any control over the assigned acreage. The lease specifically provided for division of the lease. The court held production on the assigned acreage could not be considered production upon the acreage included in the original lease and not assigned because the lease had been divided.
A review of the assignment of the leased acreage to West Virginia and of the assignment of the leased acreage to ShoVan reflects that the assignor in neither document retained any overriding royalty nor did he place any drilling obligation or obligation of other kind in connection with the lease performance upon the assignee which circumstances are identical to those contained in the act of assignment reviewed in Roberson v. Pioneer.
The Bernstein lease contained no specific provision authorizing the division of the lease such as required by Smith and Roberson. The stipulation and transaction of compromise executed on January 16, 1945 supplies the requirement of Smith and Roberson that the lessor agree to the division of the lease. This document and judgment rendered pursuant to it establishes that subsequent to these transactions that the lease owned by West Virginia would remain in existence only so long as there was production upon the acreage adjudicated as covered thereby. Production by ShoVan upon its confirmed leased acreage would not have the effect of maintaining the viability of the West Virginia lease because acreage subject to these assignments had been divided into separate leases and could no longer be considered as one leased tract under the Bernstein lease.
Not only did West Virginia fail to produce minerals from its leased acreage in paying quantities during the year 1977, it failed to produce any minerals whatsoever from the leased premises from November 1977 up to about the day of the trial of the preliminary injunction on March 10, 1978.
Defendant argues that the four wells which were drilled upon plaintiffs' property by sublessee Teel in September and October of 1977 had the effect of maintaining the viability of the lease.
"Where the output of a gas well either cannot be, or in fact is not, (emphasis added) disposed of, the well cannot be said to be a paying proposition either for the owner of the land or for the owner of the well; and, where a well has ceased to be a paying proposition for any one concerned, it has clearly ceased to produce gas in paying quantities." Smith v. Sun Oil, 172 La. 655, 135 So. 15 (1931).
In the decision of Davis v. Laster, 242 La. 735, 138 So.2d 558, 565 (1962) a gas well drilled and completed capable of production was permitted to maintain the lease beyond the primary term solely upon the basis that constructive production was in effect by virtue of the lessee paying shut-in royalties:
The production required to maintain the lease must be either actual or constructive. It is not actual production here. Lessees, by paying the shut-in royalty prior to the expiration of the primary term, seek thereby to put constructive production into operation effective with the expiration of the primary term and thereby continue the life of their lease.
The shut-in clause is specifically designed to enable the lessees to protect their investment in a shut-in well beyond the primary termâ for, at the expiration of the primary term, they can no longer pay *276 delay rentals to maintain the lease and they cannot produce the gas from the well they have discovered where no market is available. Therefore, if it were not for the shut-in clause, and the constructive production resulting from its application, the lease would be forfeited for expiration of its term at the end of the primary term.
In the instant case there was no provision for shut-in royalty provided for in the Bernstein lease. There has been neither actual nor constructive production from the four wells drilled on the plaintiff's property during September and October 1977. Because of the absence of production and marketing, the lease has terminated. See Landry v. Flaitz, 245 La. 223, 157 So.2d 892 (1963) wherein the court held that drilling of a well capable of producing minerals in paying quantities does not satisfy the requirement that oil, gas or some other minerals be produced in order to continue the lease beyond the primary term.
The defendant pleads in its answer that plaintiffs are estopped to claim the lease terminated because they allowed the drilling of the wells on their respective property. There is no evidence that the plaintiffs did anything to encourage the drilling of these wells and for that reason there is no basis for the consideration of the issue of estoppel.
Defendant asserts that plaintiffs Smith and Ditta are particularly estopped from urging the cancellation of the lease because they signed an agreement permitting Teel to cross their property included in this litigation to a well site located on another tract owned by Smith. This agreement was signed after the defendant's sublessee had obtained a temporary restraining order enjoining Smith and Ditta from "denying or attempting to deny petitioner and his drilling contractor ingress and egress to the following described property:
NE- of SE- of Section 6,
Township 18 North, Range 4 East,
Ouachita Parish
and further restraining, enjoining and prohibiting them from preventing or attempting to prevent plaintiff and Vernon Thompson and employees, from the drilling of the well that had been spudded in on the said property."
The TRO was obtained following Ditta's physical obstruction of the sublessee from access across his property which the sublessee needed to cross in order to get to property owned by Smith, but on which Smith did not own the minerals, on which the well site was located. The suit was not pursued beyond the TRO because of the execution of the agreement contained in footnote 5.[5]
*277 A review of this agreement reflects that Ditta and Smith each received $1,000 for damages for a 6 foot right of way on each side of their respective property line and along a preexisting cleared Louisiana Power and Light Company right-of-way. This agreement also contained a promise by Ditta and Smith "not to interfere with the lessee's ingress and egress along the above mentioned path and cleared Louisiana Power and Light Company's right of way, or with lessee's operations on the West Virginia Oil and Gas Company lease." The situation wherein this agreement was signed dealt with a problem related to West Virginia's exercise of rights as a lessee for the purpose of drilling a well on acreage not included in the present law suit and under which the minerals were not owned by Smith. Under these circumstances this agreement cannot be construed to mean that Smith and Ditta intended by its terms to confirm the existence of a valid lease in favor of West Virginia on the 80 acres owned by them involved in the present litigation, on which there had been no production since 1959. This agreement cannot be
WITNESSES: DITTA INVESTMENTS, INC., DAVID
Mary S. Johnson /s DITTA AND VICTOR DITTA
Una Williams /s By: David Ditta /s
Mary S. Johnson /s By: Victor Ditta /s
Una Williams /s
Mary S. Johnson /s William A. Smith /s
Una Williams /s WILLIAM A. SMITH
Mary S. Johnson /s WEST VIRGINIA OIL AND GAS CO.
Una Williams /s By: James H. Trousdale, Jr. /s
Mary S. Johnson /s ROY M. TEEL, JR., by Peter Herbst
Una Williams /s By: Peter Herbst /s
 PETER HERBST
 George Wear Jr./s
 NOTARY PUBLIC"
*278 construed to create a lease where one did not in fact exist. This September agreement had no effect on Smith and Ditta's right to demand a cancellation of the lease following the total cessation of production in November 1977, nor upon their right to demand such cancellation when their investigation disclosed an absence of production in paying quantities from the lease prior to its total cessation of production.
There is no reason why the defendant is in a different, more advantageous position than the lessees in Smith v. Sun Oil, 172 La. 655, 135 So. 15 (1931) and Landry v. Flaitz, supra, who drilled their wells while the lease was clearly valid and yet the existence of these wells capable of production, but not in production, did not serve to meet the lease requirements of production in paying quantities.
Plaintiffs are not required to establish irreparable harm in order to enjoin the interference with their right of possession and ownership by the defendant who has no lease upon their property. Plaintiffs are entitled to a preliminary injunction under the provisions of C.C.P. Article 3663.

DISMISSAL OF PLAINTIFFS' SUIT AGAINST AN UNINCORPORATED ASSOCIATION
Defendant filed articles of incorporation with the recorder of mortgages of Ouachita Parish, Louisiana on March 3, 1920, but failed to file a certified copy of the article with the Secretary of State as required by Act 267 of 1914 and LSA-R.S. 12:25 of the 1968 Business Corporation law. Following the recordation of these articles of incorporation, defendant engaged in numerous activities in a corporate capacity and became a de facto corporation. Bond and Braswell v. Scott Lumber Co., 128 La. 818, 55 So. 468 (1911); Supreme Council of the Valley Free and Accepted Order of America v. Lee, 171 La. 433, 131 So. 289 (1930). The defendant properly recorded its articles of incorporation in the office of the Secretary of State on March 13, 1978, and received a formal certificate of incorporation from that office. Under these circumstances the trial court's dismissal of the suit herein directed against West Virginia as an unincorporated association was proper.

NONJOINDER OF INDISPENSABLE PARTIES
Plaintiff appeals the trial court's judgment sustaining defendant's exception of nonjoinder of indispensable parties. The judgment provides: "plaintiff shall have a period of ten (10) days from the date hereof within which to join all indispensable parties." Such ruling is an interlocutory judgment and is not before this court on appeal. No judgment was rendered dismissing plaintiffs' suit for noncompliance with the trial court's order to amend the petition to join indispensable parties within ten days. Should the trial court dismiss plaintiffs' action for failure to amend, the judgment will be final and appealable. People of Living God v. Chantilly, 251 La. 943, 207 So.2d 752 (1968); Williams v. DeSoto, Bank & Trust Co., 185 La. 888, 171 So. 66 (1936); Washington v. Flenniken Construction, 188 So.2d 486 (La.App. 3d Cir. 1966); Ricks v. Roberson, 349 So.2d 961 (La.App. 1st Cir. 1977).

CONTEMPT
The defendant was not guilty of contempt of court for clearing of the pipeline right of way prior to the service of the TRO.

SUMMARY
For reasons assigned, the trial court judgment insofar as it denies the plaintiffs a preliminary injunction is reversed and set aside. The judgment is amended to provide:
IT IS ORDERED that conditioned upon plaintiffs' giving bond with good security in an amount to be set by the district court that West Virginia Oil and Gas Company, Inc., its agents, employees and sublessees, and all persons in concert with them, are enjoined from entering upon the property of the plaintiffs for the purpose of constructing a pipeline and are enjoined from disposing, alienating, or producing any gas from plaintiffs' property.
*279 The case is remanded to the district court for the purpose of having the trial judge set the amount of the bond required by C.C.P. Article 3610,[6] and for further proceedings in accordance with law.
As amended, the trial court's judgment is affirmed at the cost of the appellees.
NOTES
[*] PRICE & HALL, JJ., dissented from refusal to grant rehearing.
[1] On January 18, 1978, Teel assigned a part of his interest in the farmout agreement to his daughter, Margaret Herbst, wife of Peter Herbst, and to his son, Roy M. Teel, Jr. These instruments were recorded on January 26, 1978.
[2] "An assignee or sublessee is bound by any notice or demand by the lessor on the lessee unless the lessor has been given written notice of the assignment or sublease and the assignment or sublease has been filed for registry. If filing and notice have taken place, any subsequent notice or demand by the lessor must be made on the assignee or sublessee." LSA-R.S. 31:132.
[3] C.C.P. Art. 3663 provides that: "Injunctive relief, under the provisions of Chapter 2 of Title 1 of Book VII, to protect or restore possession of immovable property or of a real right, is available to: . . .

(2) A person who is disturbed in the possession which he and his ancestors in title have had for more than a year of immovable property or of a real right of which he claims the ownership, the possession, or the enjoyment."
[4] "When a mineral lease is maintained by production, the production must be in paying quantities. It is considered to be in paying quantities when the production allocable to the total original right of the lessee to share in production under the lease is sufficient to induce a reasonably prudent operator to continue production in an effort to secure a return on his investment or to minimize any loss." LSA-R.S. 31:124.
[5] "Monroe, Ouachita Parish,
 Louisiana
 September 20, 1977

This document will evidence our agreement as follows:
Definitions:
"Ditta" shall mean Ditta Investments, Inc., David Ditta and Victor Ditta.
"Smith" shall mean William A. Smith
"Lessee" shall mean West Virginia Oil and Gas Co., its successors and assigns, including without limitation Peter Herbst and Roy M. Teel, Jr.
"Landowners" shall mean "Ditta" and "Smith"
Landowner agrees that Lessee, in order to gain access to its drill sites on Landowner's property, shall have the right to clear a path 12 feet in total width, the center of which shall be the property line between Smith and Ditta which divided the E/2 and W/2 of the SW/4 of the NW/4 in Section 5, Township 18 North, Range 4 East, Ouachita Parish, said path to be 6 feet in width on the Ditta property and 6 feet in width on the Smith property and shall extend from the Smith Road to the Louisiana Power and Light cleared right-of-way. Lessee shall conduct all clearing operations in a workmanlike manner, remove all debris, level its ground and relocate Smith's existing fence on Smith's side of the path. Landowner further agrees that Lessee may use the cleared right of way of Louisiana Power and Light to gain access to drill sites and wells located on the West Virginia Oil and Gas Company lease. Lessee's right to use said path for access shall be subject to the right of landowners to designate another route of ingress and egress to drill sites or wells on the West Virginia Oil & Gas Company Lease which new route must provide Lessee with reasonable access to those wells. In constructing the 12 foot path, Lessee shall install a culvery, cattle guard, or similar installation sufficient to allow normal drainage of the ditch adjacent to Smith Road.
Lessee shall pay the sum of $1,000.00 each to Smith and Ditta, which sum shall be solely for compensation of all damages incurred by Landowner by reason of clearing the above mentioned 12 foot path, but shall be all compensation due therefor.
Lessee shal pay the sum of $616.00 to Ditta and $300.00 to Smith, which sum shall be solely for compensation of all damages and attorneys fees incurred by Ditta and/or Smith by reason of the issuance of a temporary restraining order against them on September 15, 1977, but shall be all compensation due therefor.
Lessee agrees to restore the driveway of David Ditta to its condition as it existed prior to Lessee's recent use thereof.
Landowners agree not to interfere with Lessee's ingress and egress along the above mentioned path and cleared Louisiana Power and Light right of way or with Lessee's operations on the West Virginia Oil and Gas Company Lease.
Lessee agrees that his claim for damages and attorney fees of whatever nature resulting from Landowners' actions occurring prior to the date of this agreement may not be asserted in any legal proceeding except as set off and compensation for present Lessee's operations on Landowners' property. Such damages alleged to have been sustained by Lessee shall be subject to proof in accordance with law as to both Landowners' alleged liability therefor and the amount of said damages, provided, however, that Lessee agrees that the damages sustained by Lessee prior to the date of this agreement shall not exceed the sum of $9,000.00. Except insofar as said damages may be claimed by Lessee as set off and compensation as hereinabove provided, Lessee hereby releases Landowners from any and all liability therefor.
All parties agree to meet at the earliest mutually convenient date and to negotiate in good faith an agreement regarding all surface operations to be conducted by Lessee in the future, to definitely fix the area of the surface which Lessee shall be entitled to use and to provide covenants by Lessee not to use the remaining surface area.
Landowners specifically reserve all rights to claim present or future damages resulting from Lessee's present or future operations on Landowners' property except for those hereinabove settled.
All persons who sign this document hereby represent to all other parties to this agreement that they are duly authorized and empowered to act for the persons, firms or corporations for whom they execute this agreement.
[6] C.C.P. Art. 3610â "A temporary restraining order or preliminary injunction shall not issue unless the applicant furnishes security in the amount fixed by the court, except where security is dispensed with by law. The security shall indemnify the person wrongfully restrained or enjoined for the payment of costs incurred and damages sustained."