410 So.2d 1283 (1982)
CCH, INC., Plaintiff-Appellant,
v.
Joel HEARD, Defendant-Appellee.
No. 8590.
Court of Appeal of Louisiana, Third Circuit.
February 3, 1982.
Self & Burkett, Don M. Burkett, Many, for plaintiff-appellant.
Davis & Simmons, Kenneth N. Simmons, Many, for defendant-appellee.
Before GUIDRY, SWIFT and STOKER, JJ.
SWIFT, Judge.
The plaintiff-lessee, CCH, Inc., filed this suit to enjoin defendant-lessor, Joel Heard, from preventing plaintiff's entry upon the leased property to operate its oil well. The defendant answered, alleging the mineral *1284 lease had terminated. From a judgment declaring the termination of the lease, the plaintiff has appealed. The defendant has filed a motion to dismiss this appeal.
The mineral lease was executed on November 21, 1979. It had no primary term, but contained the following provision:
"Lessee agrees to commence operations for the drilling of a well on the leased land (Joel Heard) within 30 days after completion of the well on Douglas Heard lease, either as a producing well or plug and abandonment."
The Douglas Heard well was completed December 30, 1979, and the Joel Heard well was spudded in on January 1, 1980. The latter was completed on January 5, 1980. After the construction of a tank battery and the installation of electric lines, production began in February. From February 2 to 14, 1980, the well produced 33 barrels of oil. However, it also produced a large amount of salt water, 100 barrels or more a day, which cost the lessee approximately $1.00 a barrel to haul off the premises.
After four or five months CCH, Inc., determined that the existing equipment was inadequate to handle the salt water flow, so it increased the size of the tubing from 2 3/8 inches to 2 7/8 inches in diameter and installed a larger pump. A salt water disposal system, connected to a disposal well on other property, was constructed in August, 1980.
There have been many prolonged periods of inactivity on this lease. Some shutdowns of the well occurred because of mechanical failure of the pump and the conversion to new equipment. Several times the pump was found to have been turned off by persons unknown. Each time the well was down the salt water level would rise, requiring more water to be pumped to resume production of oil. On November 22, 1980, the well was shutdown because the cups on a valve were worn out. Nothing was done until February 19, 1981, when the well was pulled and the valves were redressed. The pumping was resumed that day, but within hours the well was shutdown again because of a hole in the tubing. No oil has been produced since November 22, 1980.
The well cost approximately $120,000.00 to drill, complete and equip. In addition, about $20,000.00 of the cost of the salt water disposal well and system has been allocated thereto. The plaintiff's president first testified that production and maintenance costs since completion have amounted to approximately $30,000.00. However, he corrected this saying he only knew they had spent a total of about $150,000.00 by the end of 1980. Of this sum CCH, Inc., put up about $8,000.00. The balance was furnished by its investors. The well has produced only 127.5 barrels of oil. These were sold on November 30, 1980, for $35.92 per barrel. After taxes the value of the oil was $4,011.62 of which the plaintiff received approximately $577.00 in royalty.
About February 23, 1981, Mr. Heard constructed a fence across the access road to the well and posted thereon a "No Trespassing" sign. Plaintiff filed this suit to regain access to the well.
The defendant's position is that the lease lasped for the following reasons:
"(a) Lack of production in paying quantities sufficient to maintain and hold said lease;
"(b) Failure by Plaintiff to produce, maintain and operate this lease as a reasonable and prudent operator; and
"(c) Failure to comply with the ninety day habendum clause set forth in Paragraph 6 of said lease."
By agreement this matter was heard on both the injunction issue and the merits concerning lease termination. Judgment was rendered in favor of the defendant decreeing that the lease had terminated on the grounds that the well had ceased to produce in paying quantities and the plaintiff had not acted as a prudent operator. The judge concluded the defendant failed to prove a lack of activity for any continuous 90 day period.
After the judgment was signed the plaintiff filed another petition to enjoin the defendant from prohibiting its entrance on *1285 the property to remove the equipment, alleging that the lease had been declared terminated and cancelled by judgment. Later it appealed devolutively.
In his motion to dismiss the appeal the defendant contends that the plaintiff acquiesced or confessed judgment by filing the subsequent petition of injunction asserting that the previous judgment terminated the lease.
Article 2085 of the Louisiana Code of Civil Procedure states:
"An appeal cannot be taken by a party who confessed judgment in the proceedings in the trial court or who voluntarily and unconditionally acquiesced in a judgment rendered against him. Confession of or acquiescence in part of a divisible judgment or in a favorable part of an indivisible judgment does not preclude an appeal as to other parts of such judgment.
A confession of judgment precluding an appeal must "consist of an admission by a party in the proceedings in the trial court of the validity of his opponent's claim in such a way as to leave no issue to be tried." Martin v. Holzer Sheet Metal Works, Inc., 376 So.2d 500, 502 (La.1979).
Acquiescence in a judgment by a party precluding an appeal must be voluntary and unconditional. La.C.C.P. Article 2085; Ponder v. Pechon, 169 So.2d 671 (La. App. 1 Cir. 1964), writ not considered 170 So.2d 868 (La.1965). Forfeiture of a party's right to an appeal through acquiescence should only be decreed when the party's intention to acquiesce and abandon this right is clearly demonstrated. Succession of Marcel, 387 So.2d 1363 (La.App. 1 Cir. 1980).
In the present case the secretary-treasurer of CCH, Inc., did testify that his company wanted to remove the equipment because the court had declared the lease null and void. However, at no time, either before or after the judgment was rendered, did the plaintiff or its officers make a judicial admission as to the validity of the opponent's claim or demonstrate clearly an intention to acquiesce in the judgment and abandon its right to appeal. By filing the second petition for injunction, the plaintiff merely acted to protect its property. Therefore, the defendant's motion to dismiss is without merit.
On this appeal the plaintiff contends that the judge erred in determining that the well was not producing in paying quantities and that the plaintiff did not act as a prudent operator of the well. Under our system of appellate review such factual determinations by the trial court should not be disturbed unless clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978); and Canter v. Koehring Co., 283 So.2d 716 (La.1973).
In regard to production in paying quantities on a mineral lease LSA-R.S. 31:124 states in pertinent part:
"When a mineral lease is being maintained by production of oil or gas, the production must be in paying quantities. It is considered to be in paying quantities when production allocable to the total original right of the lessee to share in production under the lease is sufficient to induce a reasonably prudent operator to continue production in an effort to secure a return on his investment or to minimize any loss."
The absence of production in paying quantities will terminate a mineral lease which is beyond the primary term. See Smith v. West Virginia Oil & Gas Co., 365 So.2d 269 (La.App. 2 Cir. 1978), reversed on other grounds 373 So.2d 488 (La.1979); and the comment under the above section of the Louisiana Mineral Code.
As heretofore mentioned, the lessee expended on this well $150,000.00 from commencement of operations on January 1, 1980, until the end of that year. Of this amount the well cost approximately $120,000.00 and $20,000.00 was allocated as its share of the salt water disposal system in the field. Although the exact amount of the cost of operation and maintenance was not given by the operator, it is clear that it spent at least $10,000.00 for this in 1980 and *1286 some additional costs were incurred when the well was pulled and pumping was restored temporarily on February 19, 1981.
The plaintiff's president testified that it cost about one-half barrel of oil a day to pay for the pumper or gauger, electricity and handling of the salt water, excluding the cost of repairs. This would mean that the well had to produce 182½ barrels a year to pay for its own operation without yielding a profit. Actually, it produced only 127.5 barrels of oil during the some 58 weeks of its operation by the plaintiff. According to our calculations, the lessee's share of the net value of such oil, $4,011.62, was $3,343.02. Since it admittedly spent over $10,000.00 to produce same, it is clear that this well was operated by the lessee for over a year at a considerable loss. There is nothing in the record to indicate that in the future the oil production will increase or that the cost of operating the well will decrease. Consequently, it is rather obvious that the production allocable to the lessee's working interest is not sufficient to induce a reasonably prudent operator to continue efforts to secure a return on his investment or to minimize his loss.
As the trial judge stated in his written reasons for judgment:
"[I]t is at once apparent that in the instant case, for several months prior to the filing of this suit has there been (sic) no production in paying quantities. In fact there was no production at all after November, 1980, and the initial, flush returns (sic) of oil was soon overrun by salt water, and from this point forward there was no production in paying quantities."
From our review of the record we are unable to say that the trial court was clearly wrong in finding that the Joel Heard well was not producing in paying quantities and that the absence thereof terminated the lease.
Since we have determined that the trial court was correct in its ruling that the lease had terminated due to the absence of production in paying quantities, we need not consider the issue of whether or not the plaintiff was a prudent operator.
For these reasons, the defendant's motion to dismiss the appeal is denied and the judgment of the district court is affirmed. All costs are to be paid by the plaintiff-appellant.
AFFIRMED.